UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TYRAH B. BROWN and KEITH A. BROWN, | ) ) ) | Case No. 2:07-CV-00302-N-BLW |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **MEMORANDUM ORDER** |
| JEFF JAYNE, JOHN VALDEZ, PHYLLIS SCOTT, NICK LAMANNA, ELAINE SAVAGE, CHRIS BREAW, and THE ESTATE OF LES BREAW, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Pending before the Court in the above-entitled matter are cross motions for

summary judgment and Plaintiff Keith Brown's ("Brown") motion for sanctions and

motion for mediation lawyer. Having fully reviewed the record, the Court finds that the

facts and legal arguments are adequately presented in the briefs and record.  Accordingly,

in the interest of avoiding further delay, and because the Court finds that the decisional

process would not be significantly aided by oral argument, this matter shall be decided on

the record before the Court.

**BACKGROUND**

MEMORANDUM ORDER - 1

Brown and his wife, Tyrah Brown ("Tyrah") filed their 42 U.S.C. § 1983 civil rights Complaint on July 12, 2007.  The civil rights claims were based upon an investigatory traffic stop by Defendant Jeff Jayne ("Jayne"), an Idaho State Police employee, just before midnight on September 16, 2006 and other actions by third parties to dispose of certain property the Plaintiffs claimed an interest in.  The Court conducted an initial review of the Complaint and determined Plaintiffs could only proceed on their claim that excessive force was directed at Tyrah allegedly causing her to have a miscarriage.  Dkt. 11.

Plaintiffs filed an Amended Complaint on December 6, 2007.  Dkt. 14.  Brown filed a Second Amended Complaint on June 27, 2008 (Dkt. 44) and Tyrah filed her Second Amended Complaint on June 27, 2008 (Dkt. 46).  Tyrah filed a Third Amended Complaint on September 4, 2008 (Dkt. 53), but Brown did not file a Third Amended Complaint.  Tyrah later stipulated to a dismissal of all her claims in this matter and the Court granted a dismissal of all Tyrah's claims against all defendants.  Dkts. 76 and 77.

The Court reviewed the Second Amended Complaints, and determined that the Plaintiffs could also proceed on the claims against Defendants Rocky Watson (Kootenai County Sheriff), Elaine Savage (Bonner County Sheriff), Sergeant Teresa Cable (Bonner County Sheriff's Deputy) and Deputy Harris (Bonner County Jail Commander) for interference with Brown's First Amendment right to receive and send mail with his wife and for retaliatory transfer of his wife to another county jail as a result of his complaint about his First Amendment right violations.  Dkt. 49.  These First Amendment claims

MEMORANDUM ORDER - 2

arose when Brown and his wife were in custody as pretrial detainees on separate criminal charges unrelated to the traffic stop by Jayne.

The Court notes that Brown's Second Amended Complaint also added an excessive force claim by Brown for a personal assault against him by Jayne on September 16-17, 2006.  Dkt. 44, pp. 4-5.  The Court did not discuss this claim in its review of the Second Amended Complaints, but Defendants seek to have their summary judgment motion apply to this claim, so the Court will consider the same.

### 1. Traffic Stop by Jayne

The traffic stop of September 16-17, 2006, was videotaped by Jayne.  The Court has reviewed the video in detail and while Brown may contest some of the events of that evening, the video is the undisputed evidence of what actually occurred that night.  For instance, Brown claims a car was following him too closely, so he slowed down trying to get the car to pass and eventually pulled over to force the vehicle to pass. Brown admits the car he was driving was not registered to him or owned by him.  Jayne records on the video tape his observations about the driver's conduct before he pulls over to see if the driver of the vehicle pulled off the road needs assistance.  Before Jayne pulls over, he activates his lights and sees if he can be of assistance, he has noted on the video tape numerous touchings or crossings of the solid white lines on the road by the driver and is observing the car to see if the driver continues driving erratically.  It is around midnight and there is no indication Jayne thinks the car is being driven by Brown (who he is familiar with from other law enforcement encounters).  There is no indication from

MEMORANDUM ORDER - 3

Brown's pleadings that he knew the car behind him at night was a police car until the overhead lights were activated.

The video also establishes the following facts:  Jayne approaches the vehicle and the officer and the Plaintiffs immediately recognize each other.  Jayne is told by Brown that Tyrah is bleeding and having a miscarriage.  Jayne tells the Browns there are warrants for them, which they deny. Jayne immediately requests back up.   Brown is very compliant and Jayne immediately handcuffs Brown behind his back, tells him he is going to jail for outstanding warrants which Brown says were taken care of.  There is, in fact, no obvious "pat down" of Brown on the video tape as he states "just take me to jail" and is immediately handcuffed by Jayne as soon as he steps out of the car.  Jayne does ask the location of Brown's wallet and is told by Brown it is in his back pocket and the wallet is removed by the officer and placed on the trunk of the vehicle.

Tyrah is upset.  She informs the officer she is bleeding and having a miscarriage, is non-compliant with the officer's requests, and demands to talk with her husband.  At one point Tyrah is pushed against the vehicle as Jayne is attempting to handcuff Tyrah.  The level of force of the restraint is unclear from the video and the officer is able to handcuff Tyrah.  She begins to calm down and become more compliant with the officer although she continues to request to speak with her husband.  The officer denies the request for her to speak to her husband, contacts dispatch to determine if there are any outstanding warrants on either person, if Brown has a valid driver's license, and to confirm who is the owner of the vehicle.

MEMORANDUM ORDER - 4

Jayne's affidavit for a warrantless arrest dated September 24, 2006, Dkt. 106-1 and Jayne's memo regarding the incident to his captain dated November 28, 2007, Dkt. 106-1, establish the undisputed fact that Jayne had been informed that Plaintiffs had failed to appear on previous felony charges the day before and warrants had been issued for their arrest.  The source of this information to Jayne was his wife, who is a deputy prosecutor for the county.  Jayne maintains that he handcuffed Brown based on his belief there was an outstanding warrant and handcuffed Tyrah because she was a safety risk when she was upset and not complying with the officer's instructions.

After contacting dispatch, Jayne was advised there were no outstanding warrants for Tyrah and that the one warrant on file for Brown was out of Washington and was a non-extraditable warrant.  Jayne also determined neither Brown, nor Tyrah had a valid drivers license.  No proof of insurance could be located in the vehicle and Jayne was informed by dispatch this was Brown's second offense for driving without proof of insurance.  The handcuffs were removed from the Plaintiffs.  Brown was given a ticket for two misdemeanor charges (Dkt. 106-1).  Jayne had Tyrah move the car further off the road, secured the car and then Jayne drove Plaintiffs to their home.

It is noted that at the time of the traffic stop, both Brown and Tyrah represented she was bleeding and suffering a miscarriage and they were driving a borrowed car at midnight to go to the hospital.  Jayne asked during the traffic stop if Tyrah wanted an ambulance and she said no.  Tyrah allowed Jayne to drive her home with Brown.  Tyrah represented in her Second Amended Complaint that her bleeding continued, that she later

MEMORANDUM ORDER - 5

had a miscarriage and that she had a history of miscarriages.  Dkt. 46, p.5.  There is no medical testimony before the Court establishing a correlation or causation between the alleged excessive force used by Jayne against Tyrah and the resulting miscarriage.

Brown testified in his deposition that the excessive force used by Jayne was as a result of physically inappropriate contact when he was patted down.  Brown claims the officer "hit me in the balls with the edges of his hands and he ran his hands up the side of my leg because he was way – way to aggressive for any officer of the law to do what he had done." Deposition of Keith Brown, Dkt. 117-1, p.50 -51.  Brown also claims it was excessive force to handcuff him for the charges of not having a license or proof of insurance.

Defendants maintain Jayne did not use excessive force against Brown and there is no evidence relating the push of Tyrah against the car by Jayne at the time of the traffic stop to the miscarriage suffered two weeks later.

### 2. First Amendment Claims

In May 2007, Plaintiffs were arrested in CR 2007-2454 and charged with the first degree murder of Les Breaw and grand theft of certain property of Les Breaw.  The Plaintiffs were held as pretrial detainees at the Bonner County Jail ("BCJ").[1]  After

---

[1]Brown argues that his legal rights are different since he was a "pretrial detainee" and not a convicted person at the time of the alleged First Amendment violations. The Court finds while some civil rights are construed more liberally for pretrial detainees than convicted inmates, the First Amendment rights in this case would not be any different for pretrial detainees or convicted persons.

MEMORANDUM ORDER - 6

problems with unauthorized communications between the Plaintiffs and threats against

Tyrah by other inmates, Tyrah was moved to the Kootenai County Jail ("KCJ").  Based

upon security concerns, most jails have policies that generally prohibit mail to or from

other inmates.   This policy applies to inmates being held in the same facility or inmates

in two different facilities.   Prior to being brought to BCJ on May 25, 2007, Tyrah had

been in custody in Montana and was allowed to write to her husband being held in BCJ

(since April 20, 2007), however, it was acknowledged and agreed to in writing that this

inmate to inmate correspondence would be read and copied. Affidavit of Doug Harris,

Exhibit B, Dkt. 108-5.

When Tyrah was brought to BCJ, the deputy in charge of the jail or Jail

Commander was Doug Harris.  Harris allowed the Plaintiffs to continue writing to each

other under the same conditions as previously imposed and agreed to while Tyrah was in

Montana -- the correspondence would be read and copied.  BCJ inmate mail policy

provides:

> At no time will detention personnel make any type of copies of any inmates mail
> either incoming or outgoing unless it is deemed to be a safety or security issue for
> the detention facility or its staff.  Any time that it is deemed necessary to copy an
> inmate's mail, detention personnel must have prior approval from their shift
> supervisor.
> . . .
>
> Bonner County inmates will not be allowed to correspond with other inmates being
> held in this facility or any other facilities without written permission from the
> requesting facility and this facility, directly or through a third party.

Jail Commander Harris allowed one letter per week between Brown and Tyrah and

MEMORANDUM ORDER - 7

mandated the letters could not discuss other inmates in the jail, discuss the procedures inside the jail, or discuss their pending criminal case for which they were in custody. Brown and Tyrah could discuss their pending federal civil rights action, but were not allowed to communicate with each other in any manner other than this written correspondence process.

At some point, it is undisputed that the Plaintiffs began circumventing the policy and leaving notes for each other in the law library and other locations in the BCJ. These violations resulted in an increased need for observation by jail personnel due to increased security risks.  In November 2007, Deputy Harris revoked Plaintiffs' correspondence privileges because of the communication violations. On November 29, 2007, Deputy Harris modified the prohibitions to authorize Plaintiffs to correspond regarding their federal civil rights, Civil Case No. 07-CV-296 filed in the United States District Court, District of Idaho.  Brown maintains the alleged security threat from the inmate to inmate correspondence was minimal and does not justify that taking away of his First Amendment rights to communicate with his wife.  Plaintiffs also argue the prohibition of correspondence by Harris was done without a due process hearing.

On November 21, 2007, the Court issued its Initial Review Order in this case, Dkt. 11.  Plaintiff alleges that because he was allowed to proceed with an excessive force claim against Jayne and filing an Amended Complaint on December 6, 2007 alleging First Amendment violations, the Bonner County Sheriff Elaine Savage, Jail Commander Harris, Teresa Cable and Kootenai County Sheriff Rocky Watson  retaliated and had

MEMORANDUM ORDER - 8

Tyrah moved to the KCJ on or about December 18, 2007.

Neal Robertson, the custody commander at KCJ, filed an affidavit indicating that Tyrah was transferred to KCJ upon the request of BCJ staff because she was continually attempting to communicate with her husband which had been prohibited and because Tyrah had been receiving threats from other inmates.  KCJ mail policy also prohibits inmate to inmate correspondence.  Tyrah remained at KCJ until February 23, 2009.  It is undisputed that Tyrah entered a plea agreement on or about February, 2009 to amended charges of accessory to felony/harboring a wanted felon and theft by receiving/possessing stolen property.  Brown maintains Tyrah was returned to BCJ after her plea was entered and questions the transfer for security reasons as pretextual.

Defendants deny the transfer of Tyrah was due to the Court's Initial Review Order or the filing of the Amended Complaint, but allege the transfer of Tyrah was due instead to the ongoing unauthorized communications between inmates and threats against Tyrah. Defendants also maintain the written jail policies on inmate mail are constitutional on their face as well as applied in this particular case.

## MOTION FOR DISCOVERY SANCTIONS

Brown requests that the Court impose discovery sanctions against the Defendants for not producing all relevant discovery materials. Defendants respond that they provided their initial disclosure of all relevant materials and Brown has not made any written discovery requests on Defendants.  Defendants argue that absent a written discovery request for a production of documents or to depose a witness, they have no duty to

MEMORANDUM ORDER - 9

provide further discovery.

Brown is proceeding pro se in this lawsuit.  Pro se litigants are held to same procedural rules as represented litigants.  *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). This Court cannot advise Brown on which discovery requests he should make.  It is up to Brown to make appropriate discovery requests as allowed by the Federal Rules of Civil Procedure and applicable District of Idaho Local Rules.  Discovery was to have been completed by January 4, 2011 per the Case Management Order in this case, Dkt. 86.  The Court informed Plaintiff in that same Order, that discovery is exchanged between parties, not filed with the Court.  Brown has provided no evidence he made any written discovery requests of Defendants through defense counsel.  Further, before a party can move for discovery sanctions, the parties must make a good faith effort to resolve their discovery disputes.  Dist. Idaho Loc. Civ. R. 37.1.[2]  No such showing has been made by Brown.  Therefore, the Court is unable to grant the requested motion for discovery sanctions.

## MOTIONS FOR SUMMARY JUDGMENT

### 1.  Standard of Review

Summary judgment is appropriate where a party can show that, as to any claim or

---

[2]Dist. Idaho Loc. Civ. R. 37.1 provides:
Unless otherwise ordered, the Court will not entertain any discovery motion, except those brought pursuant to Federal Rule of Civil Procedure 26(c) by a person who is not a party, unless the moving party through counsel or the self represented litigant, files with the Court, at the time of filing the motion, a statement showing that the party making the motion has made a reasonable effort to reach agreement with opposing attorneys or self represented litigant on the matters set forth in the motion.

MEMORANDUM ORDER - 10

defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id.* at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

MEMORANDUM ORDER - 11

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials–including the facts considered undisputed–show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

## 2.  Section 1983 Actions in General and Qualified Immunity

Congress has created a cause of action against private individuals who, while acting under color of law, violate the constitutional rights of private citizens. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, […] subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges or immunities

MEMORANDUM ORDER - 12

secured by the Constitution and laws, shall be liable to the party injured.

*Id.* In order for a plaintiff to prevail on a § 1983 claim they must show that (1) the actor

that deprived them of their rights acted under color of law and (2) the action actually

deprived them of a constitutional right.

In this case, the first requirement is not disputed by the parties. Jayne, the Bonner

County Sheriff and deputies as well as the Kootenai County Sheriff were all acting under

"color of law." Thus, it is the second requirement for a civil rights claim that is at issue

here.  Brown contends his Fourth Amendment right to be free of excessive force and his

First Amendment rights to communicate with his wife were violated.  Defendants assert

that no constitutional rights were violated and even if a constitutional right was violated

the officers are entitled to qualified immunity.

While § 1983 provides a cause of action against police officers for constitutional

violations that they might have committed, they are also entitled to qualified immunity

from § 1983 claims. Qualified immunity operates to "shield an officer from personal

liability when an officer reasonably believes that his or her conduct complies with law."

*Pearson v. Callahan*, 555 U.S. 223, 244 (2009). "Qualified immunity balances two

important interests – the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably."  *Id.* at 231.  "Qualified immunity

operates to ensure that before they [law enforcement officers] are subject to suit, officers

MEMORANDUM ORDER - 13

are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

The qualified immunity analysis of whether an officer performed their duties reasonably, turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotation marks omitted).

The court in *Pearson* rejected the mandatory two-step approach that it had announced in *Saucier v. Katz*, 533 U.S. 194 (2001). *Pearson* at 236. That approach had required courts to first decide if the defendant's "conduct violated a constitutional right" then decide whether the right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201. Courts are now free to decide either question in whatever order is most appropriate given the circumstances.

## 3. Brown's Excessive Force Claim

Brown claims Jayne used excessive force in patting him down and for handcuffing him during the traffic stop. The appropriate area of inquiry for a claim of excessive force incident to an arrest is the reasonableness test of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Supreme Court has directed the excessive force inquiry into "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. When weighing an excessive force claim, summary judgment is appropriate if the Court "concludes, after resolving all factual disputes in favor of the

plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Alternatively, "the court may make a determination as to reasonableness where, viewing the evidence in the light most favorable to [the plaintiff], the evidence compels the conclusion that [the officers'] use of force was reasonable." *Hopkins v. Andaya*, 958 F.3d 881, 885 (9th Cir. 1992). The Court can therefore find summary judgment if the force the officer used was appropriate in any circumstance, or if the circumstances in the specific case were such that the only conclusion is that the force was reasonable.

While considering this question the Court must be cognizant that "all determinations of unreasonable force "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Henrich*, 39 F.3d at 914 (quoting *Graham*, 490 U.S. at 396-97) (internal quotations omitted). In addition, a plaintiff can succeed on an excessive force claim only if they have suffered some compensable injury as a result of their treatment. *Graham* 490 U.S. at 394.

The *Graham* standard requires the Court to evaluate "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others…[, and] (3) whether [he or she] [was] actively resisting arrest at the time of the arrest." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (quoting *Chew v.*

MEMORANDUM ORDER - 15

*Gates*, 27 F.3d 1432, 1440-41 (9th Cir. 1994)) (referring to the three step approach in

*Graham*). Ultimately, the Court must weigh the interests of the government in enforcing

the law and providing for the safety of police officers and bystanders against the

individual's right to be free from intrusive and excessive force. *Graham*, 490 U.S. at 396.

In this case, the facts are undisputed as the traffic stop was captured on videotape,

so the Court need only apply the known facts to the law to determine if summary

judgment is appropriate.  The Court begins by finding that Brown's claim for excessive

force in patting him down is unsupported by the record since the video clearly reveals no

pat down of Brown's legs near his genitals.  No reasonable jury could watch the video

and find the officer used excessive force in patting down Brown.

The Court must next address the argument that handcuffing Brown was excessive

force for a traffic stop.   In applying the *Graham* factors, the Court finds in viewing the

evidence in the light most favorable to [the plaintiff], the evidence compels the

conclusion that [the officers'] use of force was reasonable." *Hopkins v. Andaya*, 958 F.3d

881, 885 (9th Cir. 1992).   At first glance, charges of failure to purchase a driver's license

and failure to have proof of insurance do not seem severe enough to justify handcuffing.

However, in determining whether probable cause to arrest exists, the officer in the field

may draw reasonable inferences from the information that he has available to him. *State*

*v. Kysar*, 783 P.2d 859, 860 (1989).  Jayne had the mistaken, but not unreasonable, belief

the driver and the passenger had outstanding warrants at the time he determined who the

occupants of the vehicle were.  The mere denial of the warrants by the occupants of the

car does not invalidate Jayne's belief which was based on information he had received

the day prior from a deputy prosecutor.  Until the information regarding outstanding

warrants was determined to be incorrect by dispatch, the officer had a reasonable basis to

handcuff Brown.

Also, the occupants of the vehicle were clearly agitated.   While Brown's yelling

was directed more at Tyrah than the officer, the officer was without backup when he

stopped to check on the vehicle.  For officer safety he was within his authority to

handcuff Brown while determining whether there were outstanding warrants, and

whether he  had a valid license or insurance.

Further, Brown was cited for two misdemeanor violations and not traffic

infractions:  failure to purchase a driver's license, pursuant to Idaho Code § 49-301 and a

second violation of operating a vehicle without liability insurance pursuant Idaho Code

§ 19-1428.  An officer must issue a citation rather than make an arrest unless there exist

circumstances under which an arrest is "required or permitted" under Idaho Code § 49-

1407.  Section 49-1407 provides:

> Whenever any person is halted by a peace officer for any
> misdemeanor violation of the provisions of this title and is not
> required to be taken before a magistrate, the person shall, in
> the discretion of the officer, either be given a traffic citation
> or be taken without unnecessary delay before the proper
> magistrate as specified in section 49-1411, Idaho Code, in the
> following cases:

MEMORANDUM ORDER - 17

> (1) When the person does not furnish satisfactory evidence of identity or when the officer has reasonable and probable grounds to believe the person will disregard a written promise to appear in court.
>
> (2) When the person is charged with a violation relating to the refusal of a driver of a vehicle to submit a vehicle to an inspection and test.
>
> (3) When the person is charged with a violation relating to the failure or refusal of a driver of a vehicle to submit the vehicle and load to a weighing or to remove excess weight therefrom.

In this case, the undisputed record supports that the first exception could apply to the traffic stop. Jayne had reasonable and probable grounds to believe he had the right to handcuff and arrest Brown since he had recently failed to appear on other charges. Dispatch informed Jayne that Brown's driver's license had been expired for several years, it was a second offense for driving without proof of insurance within the last five years, and Brown had an outstanding warrant in the state of Washington. While Jayne determined in the end he would not arrest Brown, he had the statutory authority to do so under the particular circumstances so the use of handcuffs cannot be deemed excessive force as handcuffing is the standard procedure when arresting a person. Moreover, there is no claim by Brown that the application of the handcuffs caused him physical injury. For these reasons, Jayne's motion for summary judgment on the claim of excessive force against Brown must be granted as no genuine issues of material fact exists and the use of handcuffs was not excessive.

Alternatively, even if a jury determined Jayne had used excessive force, the Court

MEMORANDUM ORDER - 18

finds Jayne would be entitled to qualified immunity for his actions because at the time of

the handcuffing he had an objectively reasonable belief there were outstanding warrants

for Brown and Tyrah and the occupants of the vehicle were upset and arguing.  The

handcuffing and placing of Brown in the patrol car was not in violation of clearly

established law and a reasonable officer could have believed his conduct was lawful.

*Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

### 4.  Brown's Excessive Force Claim Causing the Harm to His Unborn Baby

Tyrah has dismissed all her claims against Jayne.  While Brown maintains Tyrah

did not dismiss the excessive force claim against Jayne, this is incorrect as the stipulation

for dismissal is as to all claims and against all defendants.  Dkts. 76 and 77.  Therefore,

while Brown may pursue his claim of excessive force that harmed his unborn child, he

has failed to produce any medical evidence in rebuttal to the motion for summary

judgment to support this claim.  Mere conclusory statement that the push by Jayne caused

the miscarriage is insufficient to survive summary judgment.

It appears undisputed that Brown is not a medical expert.  It is a general rule in

Idaho that a layperson is not permitted to testify regarding the cause of a medical

condition unless that medical condition is within the comprehension of the ordinary lay

person.  *See Cook v. Skyline Corp.*, 13 P.3d 857, 866 (Idaho 2000); *State v. Card*, 190

F.3d 930 (Idaho Ct. App. 2008).  In this case, it appears Brown is alleging the undisputed

push of Tyrah against the car during the traffic stop caused her miscarriage two weeks

later. In making this claim, they apparently ignore the fact that both Brown and Tyrah

MEMORANDUM ORDER - 19

claimed she was bleeding and experiencing a miscarriage before Jayne stopped the vehicle.

The Court will assume for purposes of the motion for summary judgment that Tyrah did suffer a miscarriage about two weeks after the traffic stop. But the Court must also consider Tyrah's Second Amended Complaint where she indicated she was suffering a miscarriage on September 16, 2011 and had a history of miscarriages. Therefore, Brown needs to provide some medical evidence that the push by Jayne was of such force that it was the cause of, or in some way contributed to, the miscarriage in this particular case. Absent such medical testimony, Jayne is entitled to summary judgment on this claim of excessive force causing harm to Brown's unborn child. The causes of miscarriages are not normally within the knowledge of a lay person and Brown has not created a genuine issue of material fact by his speculation the push by Jayne caused the miscarriage.

## 5. First Amendment Claim Regarding Jail Mail Policy

Brown claims the restrictive mail policies of the jails violated his First Amendment rights to communicate with his wife. It is undisputed that the correspondence between Brown and Tyrah was read and copied. It is also undisputed that no hearing was held when the right to written correspondence was prohibited by Jail Commander Harris between Brown and Tyrah. Brown does not dispute the fact that he and Tyrah were violating the written communication policies of the BCJ when they were hiding notes for each other in the jail. Brown does not dispute that Tyrah consented to

MEMORANDUM ORDER - 20

her correspondence with Brown being copied when she was being held in Montana. Brown does not dispute the conditions Harris established of allowing inmate to inmate correspondence between the Plaintiffs at BCJ included the copying of the correspondence and the limitation on the subject matter of the communication.  Brown does not dispute that written mail policies exist at BCJ and KCJ or that he was prohibited from receiving legal mail from his attorney.

### A. Inmate to Inmate Mail

The standards governing First Amendment claims of the incarcerated were outlined by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987).  There, the Court examined the free speech issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions.  The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Id.* at 89.  The Court identified four factors to consider when determining whether a regulation is valid: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" exist.  *Id.* at 89-90.

The principle that inmates retain at least some constitutional rights must be

MEMORANDUM ORDER - 21

weighed against the recognition that prison authorities are better equipped than courts to make difficult decisions regarding prison administration. *Washington v. Harper*, 494 U.S. 210 (1990). Accordingly, there need be only a rational connection between a prison policy and a legitimate governmental interest put forward to justify it. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987). The burden of proof under the *Turner* analysis is on the prisoner to disprove the validity of the prison regulation at issue. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

In examining the inmate to inmate mail policies of both BCJ and KCJ, the Court finds there is a  rational connection between the prison regulation and the legitimate governmental interest put forward to justify the policies.  Harris and Robertson set forth in their affidavits the security risks associated with inmate to inmate communications: the communication of escape plans, coordinating movement of contraband in and out of the facility, coordinating violent acts against jail personnel, developing and maintaining informal organizations, tracking the movements of corrections staff and/or other inmates, and the use of coded messages which make it difficult for jail personnel to determine whether a letter between inmates poses a risk.   Dkts. 108-4 and 108-5.   Alternatives for communication were provided to the Plaintiffs by Harris. They could write a letter once a week that would be read and copied and could not discuss certain issues.  The conditions were necessary to protect all inmates since there had been threats against Tyrah and the Plaintiffs faced serious charges of first degree murder.  It is undisputed by Brown that he and his wife violated the conditions of correspondence and at least one of them attempted

MEMORANDUM ORDER - 22

to leave notes in different locations in the jail.  Because there was a rational basis for the mail policies and Plaintiffs' actions led to the loss of the alternative means to communicate, the First Amendment cannot proceed as Brown has not carried his burden to disprove the validity of the prison regulations at issue.

### B.  Failure to Provide a Hearing.

While not included in the Second Amended Complaint, Brown now tries to add a claim that he was denied a due process hearing when his inmate to inmate mail privileges were terminated.  The Court notes Brown failed to file a Third Amended Complaint when granted leave to do so by the Court. The jail mail policies do not provide for a due process hearing and the inmates are on notice of the policies that generally prohibit inmate to inmate correspondence for safety reasons. Moreover, before a plaintiff can bring a claim for a violation of due process rights he needs to establish he has exhausted administrative remedies at the jail for relief.

Pursuant to the Prison Litigation Reform Act of 1995 (PLRA),[3] a prisoner is required to exhaust all administrative remedies within the prison system before he can bring a civil rights lawsuit challenging the conditions of his confinement. 42 U.S.C. § 1997e(a). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The *Jones v. Bock* Court noted the important policy concern behind requiring

---

[3] 110 Stat. 1321-71, *as amended*, 42 U.S.C. § 1997e, *et seq*.

exhaustion is that it "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id.* at 204. In addition, the *Jones v. Bock* Court cited with approval the observation that "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Id.* at 219 (internal citation omitted).

Where there is an "informal[]" and "relative[ly] simpl[e]" prison grievance system, prisoners must take advantage of it before filing a civil rights complaint. *Woodford v. Ngo*, 548 U.S. 81, 103 (2006). "Proper" exhaustion of administrative remedies is required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 85. Proper exhaustion is "defined not by the PLRA, but by the prison grievance system itself." *Jones v. Bock*, 549 U.S. at 218. Therefore, the "level of detail necessary in a grievance to comply with the grievance procedures" will be defined by the prison's own grievance policy. *Id.*

In *Rhodes v. Robinson*, 621 F.3d 1002 (9th Cir. 2010), the United States Court of Appeals for the Ninth Circuit clarified that if a plaintiff wishes to add new claims to an existing lawsuit by raising them in an amended or supplemental complaint, the district court is to look to the timing of the submission of the claims to determine whether the newly-added claims were timely exhausted. The *Rhodes* Court held that "a prisoner must exhaust his administrative remedies for the claims contained within his complaint before

MEMORANDUM ORDER - 24

that complaint is tendered to the district court." *Id*. at 1005. Particularly, the Court agreed that inmate Rhodes correctly argued that "the new claims in his second amended complaint should not have been dismissed, because they were properly exhausted *before* he tendered his second amended complaint to the district court for filing." *Id*. (emphasis in original).[4]

*Rhodes* does not overrule United State Supreme Court precedent requiring exhaustion before a claim is brought in federal court. Rather, construed together, these cases dictate that, if a claim was included in the original complaint before the claim was exhausted, the claim cannot be exhausted during the pendency of the lawsuit and pursued in an amended complaint, but, rather, such claims must be dismissed without prejudice. To permit *Rhodes* to override § 1997e(a)'s exhaustion-first rule would contradict the letter and spirit of *Woodford v. Ngo*, 548 U.S. 81, 103 (2006), which held that "proper" exhaustion of administrative remedies under § 1997e(a) means that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a *precondition* to bringing suit in federal court." *Id*. at 85 (emphasis added). Such a rule would also encourage inmates to disregard the exhaustion-

---

[4] In *Rhodes*, the inmate asked for authorization to file a second amended complaint to add new claims that arose after the original complaint was filed. This Court does not read *Rhodes* so narrowly as to require that claims must have *arisen* after the filing date of the original complaint to be eligible for later amendment. *See id.*, 621 F.3d at 1006-07. Rather, the Court will consider permitting amendment so long as the claim was exhausted at the time it was *first presented* to the Court in a pleading for inclusion in the case, regardless of whether it arose before or after the filing date of the original Complaint.

MEMORANDUM ORDER - 25

first rule, resulting in the thwarting of the purpose of administrative exhaustion–to resolve problems *without* filing suit.

In this case, Brown has not provided any evidence he exhausted the grievance procedure of BCJ or KCJ regarding his complaints for terminating inmate to inmate correspondence with his wife, so the Court will not expand Brown's claims to include a due process claim at this stage in the litigation.

### 6.  Retaliation Claim for Transfer of Tyrah to KCJ After Amending Complaint

Brown alleges after the Court issued its Initial Review Order allowing the case to proceed and Plaintiffs amending their complaint, the Defendants Savage, Harris, Cable and Watson all retaliated against he and his wife by transferring his wife to KCJ. Defendants deny the transfer was based on the amended complaint being filed.  The parties do not dispute that written communications had been prohibited prior to the transfer due to violations of the communication policies of BCJ.

To prevail on a retaliation claim, an inmate must bring forward evidence demonstrating that (1) a state actor took some adverse action against the inmate (2) because of (3) the inmate's protected conduct (such as the exercise of free speech), and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). A "chilling effect on First Amendment rights" is enough to state an injury. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).

When the government has submitted evidence of a legitimate penological purpose,

MEMORANDUM ORDER - 26

a plaintiff must present evidence of a retaliatory motive in order to avoid dismissal or summary judgment.  *See Pratt v. Rowland*, 65 F.3d 802, 808-10 (9th Cir. 1995); *Davis v. Valdes*, 462 F.Supp. 2d 1084, 1096 (D.Ca. 2006) (plaintiff's own bare statements insufficient); *Hurd v. Garcia*, 454 F.Supp. 1032, 1050 (D.Ca. 2006).  Courts should "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  *Pratt*, 65 F.3d at 807.  However, prison officials "may not defeat a retaliation claim on summary judgment simply by articulating a general justification for a neutral process when there is a genuine issue of material fact as to whether the act was taken in retaliation for the exercise of a constitutional right."  *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

Timing can be circumstantial evidence of retaliatory intent, but timing alone is insufficient to create a genuine issue of material fact regarding retaliatory motive.  *Pratt*, 65 F.3d at 808.  Timing can be combined with other circumstantial evidence to defeat summary judgment, for example, an officer's statement suggesting an improper motive, and that officers relied on stale evidence to support their allegedly legitimate reason for the adverse action.  *Bruce v. Ylst*, 351 F.3d at 1288-89.

To begin with, Defendant Watson, the Sheriff of Kootenai County, testifies in his affidavit  he had no knowledge of the transfer of Tyrah to KCJ until the Second Amended Complaint was filed and he had nothing to do with the decision to transfer Tyrah so the retaliation claim is not applicable to him. Brown has not rebutted this evidence by Watson.  Therefore, the Court agrees that Defendant Watson should be granted summary

MEMORANDUM ORDER - 27

judgment on the claim for retaliation.

As to the Bonner County Sheriff and deputies, the factor at issue for the Court to decide is whether the action of transferring Tyrah to KCJ did or did not reasonably advance a legitimate correctional goal.  The security risks associated with inmate to inmate correspondence are legitimate penological concerns and it is undisputed that Brown and Tyrah violated the rules of correspondence allowed by the BCJ Jail Commander and written policies.  Moreover, Brown has not refuted the Jail Commander's affidavit that threats against Tyrah had been received.  Therefore, the transfer of Tyrah did advance a legitimate correctional security goal.

While it is true the timing of the transfer was shortly after the Court issued its Initial Review Order allowing the claim to proceed against Jayne, the original Complaint did not include a First Amendment violation allegation and does not involve the mail policies at the county jails.  So the Court allowing the claim against Jayne to proceed in the Initial Review Order cannot be the basis for any retaliation against Brown or Tyrah by the Bonner County Sheriff and jail deputies as Brown speculates.

While it is true the transfer occurred in December of 2007 after Harris had terminated the inmate to inmate correspondence between the Plaintiffs in November and after the Plaintiffs had filed their Amended Complaint on December 6, 2007, which included a claim for violation of First Amendment rights to correspond, the timing alone does not support the finding of a constitutional violation where a penological reasons for the transfer have not been rebutted by Brown. Brown's conclusory statements that the

MEMORANDUM ORDER - 28

claimed security risk did not exist does not create a genuine issue of material fact on this issue.  Brown presents no case law that supports his position that because he and his spouse were in jail, they have the unlimited First Amendment right to correspond and communicate with each other.  The fact Brown and Tyrah were married does not create special inmate to inmate mail privileges.  The Court finds there is no genuine issue of material fact regarding whether the transfer advanced a legitimate correctional goal of increased security and the Defendants are entitled to summary judgment on this claim.

Alternatively, even if the transfer could be shown to be an alleged constitutional violation, the Bonner County Sheriff and deputies would be entitled to qualified immunity as their actions in transferring Tyrah were not in violation of clearly established law and reasonable officers could have believed their conduct was lawful.  *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

**7. Conclusion**

After reviewing the record in this matter and viewing the facts in a light most favorable to Brown, the Court finds genuine issues of material fact do not exist that would prevent summary judgment from being entered as a matter of law in Defendants' favor.

**ORDER**

**IT IS ORDERED:**

1.  Plaintiff Keith Brown's Motion for Summary Judgment (Dkt. 114) is DENIED.

2.  Defendants Savage, Harris, Cable and Watson's Motion for Summary

MEMORANDUM ORDER - 29

Judgment (Dkt. 108) is GRANTED and all claims against these Defendants are

DISMISSED IN THEIR ENTIRETY.

     3. Defendant Jayne's Motion for Summary Judgment (Dkt. 104) is GRANTED

and all claims against this Defendant are DISMISSED IN THEIR ENTIRETY.

     4. Plaintiff Keith Brown's Motion for Discovery Sanctions (Dkt. 98) is DENIED.

     5.  Plaintiff Keith Brown's Motion for Mediation Lawyer (Dkt. 102) is DENIED

AS BEING MOOT.



DATED:  **September 28, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge

MEMORANDUM ORDER - 30